# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

—————————————————————— )
                                                                        )
LEO CORNELIUS SPURLING,                          )
                                                                        )
                Plaintiff,                                         )
                                                                        )
        v.                                                             )            Civil Action No. 17-0780 (RBW)
                                                                        )
U.S. DEPARTMENT OF JUSTICE,                   )
                                                                        )
                Defendant.                                        )
—————————————————————— )


## MEMORANDUM OPINION

The plaintiff, a prisoner at the Kentucky State Penitentiary, brings this action under the

Freedom of Information Act ("FOIA"), *see* 5 U.S.C. § 552 (2016), to obtain records maintained

by the Federal Bureau of Investigation ("FBI"), a component of the United States Department of

Justice ("DOJ"). This matter is before the Court on the parties' cross-motions for summary judg-

ment. For the reasons discussed below, the Court grants summary judgment for the defendant.

## I. BACKGROUND

### A. The Murder of Glenn Burks

"On April 29, 1988, Glenn Burks, a prisoner at the Kentucky State Penitentiary was

killed." Plaintiff's Response to Defendant's Motion for Summary Judgment with Submission of

a Cross Motion for Summary Judgment (ECF No. 31, "Pl.'s Opp'n") at 8 ¶ 12.[1]  Burks was

---

[1] The plaintiff's opposition to the defendant's summary judgment motion (pages 1-64), cross-motion (pages 64-70), and statement of material facts (pages 1-22 as designated by the plaintiff, and pages 73-94 designated by CM/ECF) are filed on the docket in a single document (ECF No. 31). Some, but not all text of the plaintiff's opposition, is presented in sequentially numbered paragraphs. Citations to the plaintiff's opposition will include the page number and, where applicable, the paragraph number designated by the plaintiff.

black, and the plaintiff, who is white, allegedly was a member of the Aryan Brotherhood. The plaintiff was indicted for Burks' murder, *id*. at 8 ¶ 13, and plead not guilty, *id*. at 9 ¶ 18. At his trial, the plaintiff testified on his own behalf, *id*. at 10 ¶ 25, and presented "alibi witness[es] . . . and impeachment witnesses . . . against the Commonwealth's witnesses," *id*. at 9 ¶ 20, one of whom "actually confessed to killing Glenn Burks," *id*. at 9 ¶ 20. Nevertheless, a jury found the plaintiff guilty. The plaintiff characterized the jury's verdict as "the outcome of a swearing contest between convicts" who testified at his trial. *Id*. at 10 ¶ 26.

Upon his conviction, the court imposed a 150-year term of imprisonment. Plaintiff's Statement of Disputed and Undisputed Material Facts (ECF No. 31, "Pl.'s SMF") ¶ 11. This sentence was designated to be served consecutively to the "two . . . life sentences he was already serving for prior murder convictions[.]" Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment (ECF No. 27-1, "Def.'s Mem."), Declaration of David M. Hardy (ECF No. 27-3, "Hardy Decl.") ¶ 28. One of the prior life sentences has now been set aside, and the plaintiff was resentenced to a 20-year term of imprisonment. Pl.'s SMF ¶ 11; *see id*., Exhibit ("Ex.") 1 (Amended Judgment of Conviction and Sentence). According to the defendant, the plaintiff is not eligible for release until September 1, 2176. Hardy Decl. ¶ 28; *see* Pl.'s SMF, Ex. 2 (Resident Record Card).

In June 2016, the plaintiff filed a Motion for DNA Testing to Support a Claim of Actual Innocence. Pl.'s Opp'n at 11 ¶ 31. In those proceedings conducted in the Lyon Circuit Court, *id*. at 13 ¶ 34, in Kentucky, *id*. at 14 ¶ 36, the plaintiff obtained a copy of a Kentucky State Police file where he found a document "indicat[ing] that at some point during the criminal proceedings . . . the FBI, through L.V. McGinty[,] became involved" in the Burks case. *Id*. at 13 (page number

designated by the plaintiff) ¶ 40.  The plaintiff also obtained the names of three prisoners who provided testimony that other prisoners – not the plaintiff – killed Burks.  *See id.*, Ex. L.

**B. Escape from the Kentucky State Penitentiary**

On June 16, 1988, the plaintiff and seven other prisoners "successfully escaped from a maximum security area of the Kentucky State Penitentiary [(KSP)]."  Pl.'s Opp'n at 9 ¶ 14; *see id.*, Ex. A at 3.  The plaintiff has submitted excerpts from two published court opinions, *see id.*, Exs. A-B, further describing the escape:

> In the early morning hours of June 16, 1988, eight men successfully escaped from the Kentucky State Penitentiary at Eddyville, Kentucky.  The eight escaped convicts were identified as [James Blanton], Derrick Quintero, William Hall, Joseph Montgomery, Ronnie Hudson, Bobby Sherman, Leo Sperling and Floyd Cook.  Sherman was apprehended on June 17, 1988.  Sperling and Cook were apprehended on June 18, 1988.  Montgomery and Hudson were seen in Lebanon, Kentucky, on June 19, 1988, and captured in Kentucky on June 22, 1988.  Hall was captured in July of 1988.  [Blanton] and Quintero were captured shortly after Hall's apprehension.

*State v. Blanton*, 975 S.W.2d 269, 271 (Tenn. 1998).  Prior to their capture, Hall, Quintero and Blanton committed two murders:

> Three of the eight escaped prisoners, Billy Hall, Derrick Quintero and James Blanton, traveled together to Stewart County, Tennessee, fifty miles from the prison, where they brutally murdered Buford and Myrtle Vester . . . .  Buford Vester was shot from an outside window.  Myrtle Vester was shot once with a high powered rifle, was shot again at close range with a sawed-off shotgun, and was stabbed repeatedly in the neck and chest.  Following a trial by jury, Hall, Quintero and Blanton were each found guilty of the murders of Buford and Myrtle Vester and sentenced to death.

*Commonwealth of Kentucky, Corrections Cabinet v. Vester*, 956 S.W.2d 204, 204 (Ky. 1997), *as modified on denial of reh'g* (Nov. 20, 1997), *and holding modified by Gaither v. Justice & Pub. Safety Cabinet*, 447 S.W.3d 628 (Ky. 2014)

According to the plaintiff, he "was singled out and charged with the [Burks] murder . . . in retaliation for his role in the escape[.]"  Pl.'s Opp'n at 10 ¶ 25.  The plaintiff "was tried and convicted for his participation in the 1988 prison escape."  *Id*. at 11 ¶ 28.  He was sentenced to an additional 15-year term of incarceration and his conviction was affirmed by the Supreme Court of Kentucky.  *See generally id*., Ex. E; *see id*., Ex F.  Montgomery, Sherman and Hudson were also tried and convicted, but their convictions were reversed.  *Id*. at 11 ¶ 29.

**C. The FBI's Investigation**

Unidentified prisoners at the KSP allegedly contacted the Kentucky Alliance Against Racist and Political Repression, resulting in  the Alliance contacting the FBI's Louisville, Kentucky field office regarding the murder of Burks and another black inmate allegedly by members of the Aryan Brotherhood.  Pl.'s Opp'n at 17-18 ¶ 56; *see id*., Ex. VV.  According to the FBI's declarant, "the FBI assisted local/state law enforcement and the Kentucky State Penitentiary in [an] investigation of civil rights violations against inmates at the Kentucky State Penitentiary by conducting interviews of inmates to determine if their civil rights were being violated."  Hardy Decl. ¶ 49.

According to the plaintiff, L.V. McGinty, the Special Agent in Charge of the FBI's Louisville field office, was assigned to investigate Burks' murder.  Pl.'s Opp'n at 19 ¶ 61.  Special Agent McGinty allegedly "[i]nterviewed numerous inmates and KSP administrative officials regarding Glenn Burks['] murder," *id*. at 22 ¶ 71(8), in a "[c]oncurrent investigation conducted with the criminal investigations by the Commonwealth and Kentucky State Police[,]" *id*. at 22 ¶ 71(9), which generated "a plethora of documents germane to the Glenn Burks murder and the 1988 prison escape," *id*. at 22 ¶ 71(10).  However, none of these documents were made available to the plaintiff during the criminal proceedings on the murder and escape charges.  *Id*. at 23 ¶

71(11).  The plaintiff concludes that the government failed to disclose "a file that contained evidence directly related to his murder and escape cases," Pl.'s Opp'n at 23 ¶ 72(3), in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

**D. The Plaintiff's FOIA Requests**

When the plaintiff obtained the Kentucky State Police file "indicat[ing] that at some point during the criminal proceedings of [his] case the FBI, through L.V. McGinty[,] became involved," Pl.'s Opp'n at 13 (page number designated by the plaintiff) ¶ 40, he sought to obtain information from the FBI "regarding the escape and documents relative to [the] civil rights investigation that was conducted in and around the time of his criminal trial proceedings," *id*. at 13 ¶ 41.  The plaintiff believed "that biological evidence in [his] case may have been turned over to L.V. McGinty of the FBI and taken to the FBI Crime lab to be tested[.]"  *Id*. at 15 ¶ 43.

The plaintiff submitted two FOIA requests to the DOJ on July 11, 2016.  *See* Complaint for Injunctive Relief ("Compl.") ¶¶ 7–8.[2]  He sought:

> copies of all documents in F.B.I. No. 819-776-P4 regarding [his] personal involvement in the June 1988 escape from the Kentucky State Penitentiary . . . or any other documents found in other files regarding the 1988 prison escape inclusive of any Federal Investigation of KSP personnel involvement in the escape as directed by Attorney General Steven Beshear of Kentucky and/or Governor Wallace G. Wilkinson.  There is reason to believe that the Kentucky Department of Corrections' Secretary's Fact Finding Report dated July 5, 1988 is also on file with the F.B.I.

*Id*., Ex. 1.  His second request sought:

> copies of all documents generated in File No. 44-113631 regarding Office of Origin File 44A-3091, Cross Ref. No. DJ 144-31-994 regarding myself . . . [from] September 1988 [through] April 1990 when the case was closed.

---

[2] The plaintiff sent his FOIA requests to the DOJ, and its staff forwarded them to the FBI.  *See* Compl. ¶ 9; *id*., Exs. 3-4.

*Id.*, Ex. 2. The FBI assigned each request a separate tracking number, *see id.* ¶¶ 10-11, and closed the second administratively, *id.* ¶ 11. Because both requests "share[d] the same information," *id.*, Ex. 6, "material responsive to the request[s] would be processed in FOIPA Request Number 1355003-000," Hardy Decl. ¶ 9.

"By letter dated September 15, 2016, the FBI informed [the p]laintiff [that] it located approximately 1,294 pages potentially responsive to . . . FOIPA Request Number 1355003-000[.]" Hardy Decl. ¶ 11; *see* Compl. ¶ 12. However, when the plaintiff filed this civil action roughly seven months later, the FBI had not released to him any responsive records. Compl. ¶ 22.

On August 21, 2017, the FBI advised the plaintiff that it had reviewed 240 pages of records, and of these pages it released to him 157 pages in full or in part, after having redacted certain information under Exemptions 6, 7(C), 7(D) and 7(E). Hardy Decl. ¶ 23. With regard to three pages of these responsive records, the FBI consulted with DOJ's Civil Rights Division, which withheld certain information under FOIA Exemptions 6 and 7(C). *See id.* ¶¶ 23, 26.

On September 21, 2017, the FBI advised the plaintiff that it had reviewed 503 additional pages of responsive documents and that it released 13 pages in full or in part, relying on Exemptions 6, 7(C), 7(D), 7(E) and 7(F) for the information it withheld. *Id.* ¶ 25. The FBI relied on these same exemptions when, on October 23, 2017, it notified the plaintiff of its decision to withhold all of the 441 remaining pages of records it reviewed. *Id.* ¶ 27.

## II. DISCUSSION

### A. Summary Judgment Standard

The Court may grant summary judgment to a government agency as the moving party if the agency shows that there is no genuine dispute as to any material fact and if it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Unlike the review of other agency action

that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'" *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)).

The Court may grant summary judgment based on information in an agency's supporting declaration if the declaration is "relatively detailed and nonconclusory[.]" *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978) (internal quotation marks and footnote omitted). Further, the supporting declaration must "describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and [is] not controverted by either contrary evidence in the record [or] by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981) (footnote omitted).

### B. The FBI's Searches for Responsive Records

An agency "fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011) (citations and internal quotation marks omitted). The agency may submit affidavits or declarations to explain the method and scope of its search, *see Perry v. Block*, 684 F.2d 124, 127 (D.C. Cir. 1982), and such affidavits or declarations are "accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents," *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citation and internal quotation marks omitted). Here, the defendant's declarant asserts that the FBI's search of its Central Records

System ("CRS") using variations of the plaintiff's name as search terms was a reasonable search. *See* Hardy Decl. ¶¶ 36-40.

The CRS contains "applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI in the course of fulfilling its integrated missions and functions as a law enforcement, counterterrorism, and intelligence agency[.]" *Id*. ¶ 29. These files "are organized according to designated subject categories," such as investigations the FBI conducts. *Id*. ¶ 30. "[G]eneral indices to the CRS are the index or 'key' to locating records within . . . [the] CRS." *Id*. ¶ 31. These indices are arranged in alphabetical order and fall within two categories: (1) "main" entries carrying the name of the individual, organization, or other subject matter that is the designated subject of the file, or (2) "reference" or cross-reference entries mentioning an individual who is within a main file indexed to a different individual or subject matter. *Id*. "FBI employees may index information in the CRS by individual (persons), by organization (organizational entities, places, and things), and by event (*e.g.*, terrorist attack or bank robbery)." *Id*. ¶ 32. An individual's name "may be recorded with applicable identifying information such as date of birth, race, sex, locality, Social Security Number, address, and/or date of an event." *Id*. ¶ 34. While the FBI's systems have been upgraded over the years, *see id*. ¶¶ 33-35, the index search methodology still applies, *see id*. ¶ 38.

The FBI's declarant explains that the CRS is the "only system of records where information pertaining to [the plaintiff's] request would likely be maintained," *id*. ¶ 37, because it "is where the FBI indexes information about individuals, organizations, events, and other subjects of investigative interest for future retrieval," *id.* Accordingly, in August 2016, FBI staff searched the CRS using variations of the plaintiff's name "in order to identify responsive investigatory files responsive to [his] request and subject to the FOIA." *Id*. ¶ 39. The search yielded "the two

. . . main files" identified by the plaintiff in his requests: 44-HQ-113361 and 44A-LS-309. *Id.*

After the plaintiff filed this lawsuit, in July 2017, FBI staff conducted a second search "to confirm the accuracy of its previous search . . . and to identify any potentially responsive cross-reference files indexed [under the plaintiff's] name." *Id.* ¶ 40. This second search disclosed no records other than those identified in the August 2016 search. *Id.*

The plaintiff acknowledges that "the FBI did conduct a reasonable search for documents germane to [his] two . . . FOI[]A requests." Pl.'s Opp'n at 3. He does not dispute "the reasonableness of the search, or the methods employed, but rather the Government's refusal and/or failure to locate and produce records responsive to his FOIA [request] that are not subject to any FOIA exemptions, and relate directly to the 1988 prison escape[.]" Plaintiff's Reply to Defendant's Response and Opposition (ECF No. 47, "Pl.'s Reply") at 4-5; Pl.'s Opp'n at 32-33. For example, the plaintiff obtained through a Kentucky Open Records Request a document containing "an FBI referencing number '819-776-P4,'" Pl.'s Opp'n at 33 ¶ 91, which he submitted with his FOIA request, *see* Compl, Ex. 1, yet the FBI did not locate and disclose it, Pl.'s Opp'n at 33 ¶ 91. Similarly, he sought a copy of "the Kentucky Department of Corrections[] Secretary's Fact Finding Report dated July 5, 1988 [, believed to be] on file with the F.B.I.," Compl., Ex. 1, and mentioned in a published opinion of the Supreme Court of Kentucky, *see* Pl.'s Opp'n, Ex. B, which the FBI did not locate and disclose, *id.* at 33 ¶ 93. And, the plaintiff learned from a published opinion of the United States District Court for the Middle District of Tennessee,[3] *see id.* at 34 ¶ 97, that "the FBI conducted a fugitive investigation at the request of Kentucky state

---

[3] *See Quintero v. Carpenter*, No. 3:09-CV-00106, 2014 WL 7139987, at *1 (M.D. Tenn. Dec. 12, 2014) (denying Quintero's petition for a writ of habeas corpus), *appeal docketed sub nom. Quintero v. Mays*, No. 18-5377 (6th Cir. Apr. 18, 2018).

authorities after Quintero and others escaped from the Kentucky State Penitentiary" and "ob-tain[ed] warrants for the arrest of Quintero and others on the federal charge [of] unlawful flight to avoid confinement," *id*. at 35 ¶ 98, yet the FBI disclosed none of this information in response to his FOIA request. Thus, in the plaintiff's view, "the FBI's search was far from adequate" be-cause there "may be a plethora of documents and information directly related to . . . documents . . . in the public domain that should have been located, disclosed and produced as responsive doc-uments to [his] FOIA request." *Id*. at 35.

"[T]he adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003) (citing *Steinberg v. DOJ*, 23 F.3d 548, 551 (D.C. Cir. 1994)). An agency "need not demonstrate . . . that it located every document that the FOIA requester expected the agency to find," *Pejouhesh v. U.S. Postal Serv.*, No. 17- CV-1684, 2019 WL 1359292, at *4 (D.D.C. Mar. 26, 2019), or that it "search[ed] every record system," *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990), or that its search was ex-haustive, *see Bigwood v. U.S. Dep't of Defense*, 132 F. Supp. 3d 124, 135 (D.D.C. 2015). As *Bigwood* indicates, "the proper inquiry is not whether there might exist additional documents possibly responsive to a request, but whether the agency conducted a search reasonably calcu-lated to uncover relevant documents." *Bigwood*, 132 F. Supp. 3d at 135.

Here, the defendant has provided a reasonably detailed and non-conclusory declaration describing the contents and organization of the CRS and the search terms FBI staff employed to search the CRS. The declaration is presumed to have been submitted in good faith, and the plaintiff's speculation about the existence of additional responsive records neither rebuts that presumption nor creates a genuine dispute of material factual as to the FBI's compliance with its

search obligations under the FOIA. *See Davis v. FBI*, No. 18-CV-0086, 2019 WL 2870729, at

*6 (D.D.C. July 3, 2019) (rejecting requester's argument that agency's "fail[ure] to turn up a

grand jury subpoena that is referenced in some of the records it produced to him" demonstrated

the inadequacy of the search where he offered no evidence of circumstances overcoming an

otherwise adequate agency affidavit); *Richardson v. DOJ*, No. 17-CV-1181, 2018 WL 4637364,

at *4 (D.D.C. Sept. 27, 2018) (concluding that search was adequate notwithstanding the FBI's

failure to disclose incident report and audio recordings where requester did not show that agency

failed to search particular offices or files where responsive records might have been located).

The FBI's failure to locate particular documents alone does not render its search inadequate, *see

Iturralde*, 315 F.3d at 315; *Perry*, 684 F.2d at 128.   The Court therefore concludes that the FBI

conducted a reasonable search for records responsive to the plaintiff's FOIA request.

### C. The Privacy Act

Generally, the Privacy Act ("PA") provides an individual access to records maintained in

federal government files about that person. *See* 5 U.S.C. § 552a(d) ("Each agency that maintains

a system of records shall . . . (1) upon request by any individual to gain access to his record or to

any information pertaining to him which is contained in the system, permit him . . . to review the

record and have a copy made of all or any portion thereof[.]").  There are exceptions to this right,

however, and by regulation an agency may exempt a system of records from certain 3PA disclo-

sure provisions if the system is

> maintained by an agency or component thereof which performs as
> its principal function any activity pertaining to the enforcement of
> criminal laws, including police efforts to prevent, control, or reduce
> crime or to apprehend criminals, and the activities of prosecutors,
> courts, correctional, probation, pardon, or parole authorities, and
> which consists of (A) information compiled for the purpose of iden-
> tifying individual criminal offenders and alleged offenders and con-
> sisting only of identifying data and notations of arrests, the nature

> and disposition of criminal charges, sentencing, confinement, re-
> lease, and parole and probation status; (B) information compiled for
> the purpose of a criminal investigation, including reports of inform-
> ants and investigators, and associated with an identifiable individ-
> ual; or (C) reports identifiable to an individual compiled at any stage
> of the process of enforcement of the criminal laws from arrest or
> indictment through release from supervision.

5 U.S.C. § 552a(j)(2); *see* 5 U.S.C. § 552a(k)(2). The FBI's declarant explains that the "DOJ has exempted [the] FBI['s] law enforcement investigative records maintained in the CRS from the Privacy Act's access provision pursuant to [5 U.S.C. § 552a](j)(2)." Hardy Decl. ¶ 42 (footnote omitted). Accordingly, under the Privacy Act, the plaintiff "has no individual right of access to investigative records about himself." *Id.*

The plaintiff asserts "that the FBI knew and recognized that [his] two . . . requests were 'FOIA' requests, and not PA requests." Pl.'s Opp'n at 29 ¶ 88 (emphasis in original); *see* Pl.'s Reply at 5-6. He deems the position taken by the FBI as a "slight of hand," Pl.'s Opp'n at 29 ¶ 90, and strenuously objects to the "conver[sion]" of his "clearly submitted FOIA requests into requests under both the FOIA and PA," *id.* at 30, in order to "bar disclosure of documents re-sponsive to his FOIA request," *id.*, under 5 U.S.C. § 552a(j)(2). The plaintiff therefore asks the Court to reject "[t]he Government's contention that PA Exemption (j)(2) somehow applies to [his] FOIA requests[.]" Pl.'s Opp'n at 30. However, no such position has been taken by the government.

Even if the FBI could have withheld all of the responsive records under a Privacy Act ex-emption, the FBI also processed the plaintiff's request for documents under the FOIA, Hardy Decl. ¶ 43, just as the plaintiff demanded. Thus, the FBI's declarant explains, "[n]one of the in-formation exempt from disclosure under the Privacy Act has been withheld . . . unless it was withheld under a FOIA exemption." *Id.*

### D. FOIA Exemption 7[4]

#### 1. Law Enforcement Records

Exemption 7 protects from disclosure "records or information compiled for law enforce-

ment purposes," but only to the extent that disclosure of such records would cause an enumerated

harm. 5 U.S.C. § 552(b)(7); *see FBI v. Abramson*, 456 U.S. 615, 622 (1982). "To show that . . .

documents were compiled for law enforcement purposes, the [agency] need only establish a ra-

tional nexus between the investigation and one of the agency's law enforcement duties and a

connection between an individual or incident and a possible security risk or violation of federal

law." *Blackwell v. FBI*, 646 F.3d 37, 40 (D.C. Cir. 2011) (internal quotation marks and citations

omitted).

The FBI's declarant describes the agency's role as "the primary investigative agency of

the federal government with the authority . . . to investigate all violations of federal law not ex-

clusively assigned to another agency," Hardy Decl. ¶ 48, and to "provide investigative assistance

to state, local, and tribal enforcement agencies" in matters involving federal law, *id*. ¶ 49. It is in

this capacity that "the FBI assisted local/state law enforcement and the Kentucky State Peniten-

tiary in [its] investigation of civil rights violations against inmates at the Kentucky State Peniten-

tiary by conducting interviews of inmates to determine if their civil rights were being violated."

*Id*. All of the responsive records discovered in this case "were specifically compiled in the

course of the FBI's investigation of [the plaintiff] and others pertaining to civil rights violations

against inmates at the Kentucky State penitentiary in violation of federal statutes, such as 18

---

[4] "The practice of the FBI is to assert Exemption 6 in conjunction with Exemption 7(C)." Hardy Decl. ¶ 52 n.9. While the FBI does not abandon its reliance on Exemption 6, *see* Def.'s Reply at 3 n.1, the Court need not consider whether Exemption 6 applies if the same information is properly withheld under Exemption 7(C). *See Roth v. DOJ*, 642 F.3d 1161, 1173 (D.C. Cir. 2011).

U.S.C. §§ 241, 242 and 245." Hardy Decl. ¶ 43. Thus, the FBI easily has satisfied the threshold

requirement for Exemption 7, having shown that the responsive records were compiled for law

enforcement purposes.

## 2. FOIA Exemption 7(C)

Exemption 7(C) protects from disclosure information in law enforcement records that

"could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5

U.S.C. § 552(b)(7)(C). In determining whether this exemption applies to particular information,

the Court must balance the interest in privacy of individuals mentioned in the records against the

public interest in disclosure. *See ACLU v. DOJ*, 655 F.3d 1, 6 (D.C. Cir. 2011). When balancing

an individual's privacy interest against the public interest in disclosure, "the only public interest

relevant for purposes of Exemption 7(C) is one that focuses on 'the citizens' right to be informed

about what their government is up to.'" *Davis v. DOJ*, 968 F.2d 1276, 1282 (D.C. Cir. 1992)

(quoting *Reporters Comm.*, 489 U.S. at 773).

### a. Privacy Interests of Third Party Information Sought
### by the Plaintiff

#### *i*. FBI Special Agents and Support Personnel

Under Exemption 7(C), the FBI has withheld the names and identifying information

about "FBI Special Agents . . . responsible for conducting, supervising, and/or maintaining the

investigative activities reflected in the documents responsive to [the plaintiff's FOIA] request be-

cause the individuals' privacy interests outweighed any public interest in disclosure." Hardy

Decl. ¶ 54. A Special Agent does not choose his or her assignments, *id*. ¶ 55, and in the course

of "conduct[ing] official inquiries . . . , conducting searches and making arrests," he or she

"come[s] into contact with all strata of society," *id*., including individuals who may "carry a

grudge," or "may seek revenge on the agents . . . involved in a particular investigation," *id*. Further, as the FBI declarant explains, "publicity associated with the release of an agent's identity in connection with a particular investigation could trigger hostility toward" the agent. *Id*. Accordingly, the declarant states, a Special Agent has a "substantial privacy interest[] in information about [him or herself] in criminal investigative files," *id*., and "[c]onversely, there is no public interest to be served by disclosing [the agent's] identity," *id*. And, if the public were to learn the identity of a Special Agent, such information by itself "would not . . . significantly increase the public's understanding of the FBI's operations and activities." *Id*.

The FBI advances a similar rationale to protect "[t]he names of FBI support employees . . . assigned to handle tasks related to the official investigations reflected in the documents responsive to [the plaintiff's FOIA] request." *Id*. ¶ 56. The FBI declarant explains that support personnel "are[] in positions of access to information regarding official law enforcement investigations, and therefore could become targets of harassing inquires for unauthorized access to investigations if their identities were released." *Id*. The FBI's declarant posits that "these individuals maintain substantial privacy interests in not having their identities disclosed," *id*., and it identifies "no public interest [to] be served by disclosing [their] identities . . . because their identities would not, themselves, significantly increase the public's understanding of the FBI's operations and activities," *id*.

The plaintiff claims to know the identity of the Special Agent whose name the FBI has withheld: L.V. McGinty, Special Agent in Charge of the Louisville field office. Pl.'s Opp'n at 38 ¶ 101. He also claims that Special Agent McGinty's identity "has been public knowledge," *id*. at 38 ¶ 102, since September 2016, *id*. at 38 ¶¶ 102-04, yet neither Special Agent McGinty nor the FBI has suffered any harm resulting from the knowledge of his identity. *See id*. at 38 ¶¶

105-06; *id*. at 39 ¶¶ 107-08. Further, the plaintiff points to letters he has written to federal and Kentucky state officials, *see id*., Exs. JJ-KK, filings in the Lyon Circuit Court, *see id*. at 37-38 ¶ 101, and documents he filed in this Court, *see id*., Exs. QQ-RR, which mention Special Agent McGinty by name in connection with the FBI's investigation, arguing that the information the FBI is withholding already has made its way into the public domain, such that "any protective cloak has been lost," *id*. at 38 ¶ 104. The plaintiff is mistaken.

The privacy interest at stake belongs to the individual, not the government agency. *See Reporters Comm.*, 489 U.S. at 763-65. "That interest can be waived . . . , but only by the individual whose interest is affected," *Petrucelli v. DOJ*, 153 F. Supp. 3d 355, 362 (D.D.C. 2016) (citations omitted), *aff'd*, No. 16-5042, 2016 WL 5349349 (D.C. Cir. Aug. 22, 2016) (per curiam). Even if the plaintiff knows that Special Agent McGinty may have received information from the Kentucky State Police and may have conducted an investigation involving the plaintiff, the agent's privacy interest is not extinguished because the requester knows or can surmise his identity. *See Weisberg v. DOJ*, 745 F.2d 1476, 1491 (D.C. Cir. 1984); *Petrucelli*, 153 F. Supp. 3d at 362 ("[A] government agency is not at liberty to disclose the name of or identifying information about an individual referenced in law enforcement records, even if the requester already knows, or is able to guess, the individual's identity."); *Master v. FBI*, 926 F. Supp. 193, 198-99 (D.D.C. 1996) (protecting subjects of investigative interest even though plaintiffs claimed to know their names), *aff'd*, 124 F.3d 1309 (D.C. Cir. 1997) (per curiam) (table). And, the plaintiff cites no authority for the proposition that the absence of proof that a Special Agent has been harmed warrants disclosure in this case.

Furthermore, the plaintiff's assertion that the information the FBI has withheld has found its way into the public domain is unsupported. "[A] plaintiff asserting a claim of prior disclosure

must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld," *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983) (citations omitted); *see Boehm v. FBI*, 948 F. Supp. 2d 9, 30-31 (D.D.C. 2013). This plaintiff has not done so, and therefore his argument on this point fails.

### *ii*. Other Third Party Information Sought by the Plaintiff

### (1) Interviewees

The FBI has withheld the names and identifying information about "individuals interviewed [by or who] provided information to the FBI during the course of its investigation of [the plaintiff] in regards to civil rights violations." Hardy Decl. ¶ 57. The FBI's declarant explains that information obtained through interviews is a "productive investigative tool[]," *id*. ¶ 58, and the FBI's "continued access . . . to persons willing to honestly relate pertinent facts bearing upon a particular investigation far outweighs any benefit the public might derive from disclosure of the names of those who cooperated with the FBI," *id*. Accordingly, the FBI takes the position that these interviewees' privacy interests outweigh any public interest in disclosure of their identities. *See id*.

The plaintiff notes the passage of time, nearly 30 years, since Burks' murder and the escapes. Pl.'s Opp'n at 40. Because so much time has passed, the plaintiff argues that these individuals "have lost any protected cloak, thus, there can be no Exemption 7(C) applied[.]" *Id*. at 41 ¶ 111. In addition, the plaintiff notes that there have been public trials at which hundreds have testified, post-conviction proceedings, and published court decisions which have put the withheld information into the public domain. *Id*. at 41 ¶ 114; *see generally id*. at 42 ¶ 115 through 44 ¶ 117. Lastly, the plaintiff argues that interviewees were advised that "information

furnished [by them] could become [the] subject of court testimony in the future."  Pl.'s Opp'n at 44; *see id*., Exs. V-AA.  This, in the plaintiff's view, amounts to a waiver of confidentiality.  The plaintiff's arguments are not persuasive.

An individual maintains a privacy interest even if he testifies at a public proceeding, *see, e.g., Jones v. FBI*, 41 F.3d 238, 247 (6th Cir. 1994) (rejecting the plaintiff's argument that law enforcement officer who testified at habeas proceeding "waived 7(C) protection"), or has been identified as a potential witness, *see, e.g., SafeCard Servs.*, 926 F.2d at 1205; *Petrucelli v. DOJ*, 51 F. Supp. 3d 142, 168 (D.D.C. 2014); *Lewis v. DOJ*, 867 F. Supp. 2d 1, 19 (D.D.C. 2011). Moreover, although the passage of time may diminish an individual's privacy interest, this factor does not extinguish that interest.  *See, e.g*., *Halpern v. FBI*, 181 F.3d 279, 297 (2d Cir. 1999) ("Confidentiality interests cannot be waived through prior public disclosure or the passage of time."); *Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 736 F. Supp. 2d 202, 211 (D.D.C. 2010) (finding "that the passage of time has not diluted the privacy interest at stake and, if any-thing, has actually increased [the] privacy interest as the events surrounding the . . . prosecution have faded from memory").

### (2) The Mere Reference to Third Parties In Responsive Documents

The FBI has withheld the names and identifying information about "third parties merely mentioned in the criminal investigative files responsive to [the plaintiff's] request."  Hardy Decl., first ¶ 59.  As to these individuals, the plaintiff contends that "the [g]overnment's claims are ex-aggerated and specious at best, after the passage of 30 years."  Pl.'s Opp'n at 48.  Exaggerated or not, the FBI's declaration, *see* Hardy Decl. ¶ 59, suffices to show that disclosure of such third party information "*could reasonably be expected* to constitute an unwarranted invasion of per-sonal privacy."  5 U.S.C. § 552(b)(7)(C) (emphasis added).  And, as stated above, the passage of

time alone does not undermine the FBI's argument or eliminate the third parties' privacy interests.  *See, e.g., King v. DOJ*, 830 F.2d 210, 234 (D.C. Cir. 1987).

### (3) State and Local Law Enforcement Personnel

The FBI has withheld the names and identifying information about "local/state law enforcement employees [who were] acting in their official capacities and aided the FBI in the law enforcement activities reflected in the records responsive to [the plaintiff's] requests."  Hardy Decl., second ¶ 59.  Its rationale for withholding this information is similar to the position it asserts for protecting the FBI Special Agent information, *see id.* ¶ 54, arguing that release of their identities "could subject them . . . to unnecessary and unwelcome harassment that would invade their privacy, and could cause them to be targeted for compromise," *id.* ¶ 59.

The plaintiff "strongly objects to any inference that he . . . , if possessing these public officials['] names, would target [these individuals] with nefarious motives."  Pl.'s Opp'n at 48 (internal quotation marks removed).  Otherwise, the plaintiff asserts that these individuals' identities are already known either because they testified at trial or at some other proceeding during "subsequent decades of litigation."  *Id.*  Furthermore, the plaintiff notes the government's inability to "point to a single instance where any one of them has ever been targeted by [him] or by anyone in this case or the Kentucky cases, with nefarious motives in the past 30-years[.]"  *Id.*

It appears that the plaintiff is under the mistaken impression that the FBI may withhold third party information only if its release *certainly* will endanger the protected individuals.  Not so.  However, it is sufficient that the declaration demonstrates an invasion of the third parties' privacy could reasonably occur upon release of their identities, even if they testified publicly or

if the plaintiff is able to identify them. *See* 5 U.S.C. § 552(b)(7)(C); *see also Jones*, 41 F.3d at 247; *Weisburg*, 745 F.2d at 1491.

### (4) Kentucky State Penitentiary Personnel

The FBI has withheld information concerning "Kentucky State Penitentiary personnel who cooperated [with] and provided assistance to the FBI and other law enforcement agencies during the course of the FBI's investigation of civil rights violations," Hardy Decl. ¶ 60, by "provid[ing] reports and information to the FBI in their official law enforcement capacities," *id*. Again, the plaintiff deems the FBI's claims "exaggerated and specious at best," Pl.'s Opp'n at 49, mainly because "[m]any if not all the . . . staff . . . involved in both the investigation of Glenn Burks['] murder and the 1988 prison escape are already known," *id*. Once again, the Court concludes that the plaintiff's prior knowledge of third parties' identities is of no moment.

### (5) Crime Victims

The FBI has withheld "the names and prisoner identification numbers of victims of a crime," Hardy Decl. ¶ 61, asserting that release of their identities "could cause harm . . . such as personal distress or embarrassment," *id*. The plaintiff posits that "there are several victims, three of [whom] are dead, Glenn Burks and the Vesters," Pl.'s Opp'n at 51, and perhaps a fourth, Claude Plummer, *id*. According to the plaintiff, any privacy interests the dead victims may have had expired with their deaths and that their "names are forever engraved in 30-years of permanent record litigation in two states." *Id*. With regard to Mr. Plummer, the plaintiff represents that he "is alive and well at the Kentucky State Reformatory," *id*., and "has not been subjected to any unwarranted invasion of his privacy." *Id*. Otherwise the plaintiff has not articulated why he is entitled to receive the information he seeks to obtain about these individuals.

The Court readily disposes of the plaintiff's assertion that the FBI improperly relies on Exemption 7(C) to protect the identity of a living crime victim. The plaintiff does not dispute that the relevant documents were compiled for law enforcement purposes and thus fall within the scope of Exemption 7. And, the identities of third parties appearing in law enforcement records typically are "categorically . . . exempt from disclosure." *SafeCard Servs.*, 926 F.2d at 1206; *see Schrecker v. DOJ*, 349 F.3d 657, 666 (D.C. Cir. 2003).

To the extent that the FBI is protecting the identity of a deceased crime victim, the Court recognizes that the victim's death "does diminish to some extent the privacy interest in [personal] information [about him or her], though it by no means extinguishes that interest; one's own and one's relations' interests in privacy ordinarily extend beyond one's death." *Schrecker v. DOJ*, 254 F.3d 162, 166 (D.C. Cir. 2001); *see Accuracy in Media, Inc. v. Nat'l Park Serv.*, 194 F.3d 120, 123 (D.C. Cir. 1999) ("[O]ur circuit has squarely rejected the proposition that FOIA's protection of personal privacy ends upon the death of the individual depicted [at the location of his death and during his autopsy]."). Although "the deceased . . . cannot personally suffer the privacy-related injuries that may plague the living, . . . the court must also account for the fact that certain reputation interests and family-related privacy expectations survive death." *Accuracy in Media*, 194 F.3d at 166 (quoting *Campbell v. DOJ*, 164 F.3d 20, 33 (D.C. Cir. 1998), *as amended* (Mar. 3, 1999)) (emphasis removed).

Burks and the Vesters were murdered, if not by the plaintiff, then by individuals known to or affiliated with the plaintiff. Thus, notwithstanding the passage of more than 30 years, these victims and their families retain diminished yet cognizable privacy interests which are deserving of protection. *See, e.g., ACLU v. DOJ*, 750 F.3d 927, 936 (D.C. Cir. 2014) (noting that, even if

"any of the six individuals who were the subject of the prosecutions at issue have died, the relevant privacy interests remain substantial"); *Wessler v. DOJ*, 381 F. Supp. 3d 253, 259 (S.D.N.Y. 2019) (recognizing deceased federal pretrial detainees' diminished privacy interest in their own medical records and their family members' privacy interest in the medical and autopsy records); *Dayton Newspapers, Inc. v. Dep't of Veteran Affairs*, 257 F. Supp. 2d 988, 1008 (S.D. Ohio 2003) ("[W]ithin the FOIA context, the same privacy interests that a person may have in his name when he is alive, such as the right to be left alone, the right to be free of harassment or humiliation, the right to closure, and the like, survive his death.") (subsequent history omitted). And, the plaintiff has failed to demonstrate that his interest in acquiring the information he seeks outweighs those privacy interests. *See Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171 (2004) (holding that in determining whether Exemption 7(C) applies to protect the privacy interests of individuals who have died, courts must "balance the [decedent's] privacy interests against the public interest in disclosure").

### (6) Third Parties with Criminal Records

The FBI protects "third party individuals who have a criminal record with the FBI and/or other law enforcement agencies," by withholding identifying information about them, including their "names, dates of birth, photographs, social security numbers, addresses, [and] FBI and/or law enforcement identification numbers." Hardy Decl. ¶ 62. The plaintiff "concedes that social security numbers and FBI and/or law enforcement numbers can be properly withheld under FOIA," Pl.'s Opp'n at 52, but argues that such information "is easily segregable," *id*. Further, he argues that the personal identifying information about third parties who have criminal convictions have a weaker privacy interest than a person who has been acquitted or whose criminal charges are dismissed. *Id*. The plaintiff, however, cites no authority for the proposition that a

criminal conviction extinguishes an individual's privacy interests. Furthermore, this Circuit has

held that the FOIA categorically exempts from disclosure identifying third party information in

law enforcement records on the ground that associating them with a law enforcement investiga-

tion reasonably could bring about an unwarranted invasion of their privacy. *See, e.g., Nation*

*Magazine v. U.S. Customs Serv*., 71 F.3d 885, 894 (D.C. Cir. 1995); *SafeCard Servs.*, 926 F.2d at

1205-06.

### b. Public Interest in Disclosure of the Third Party Information

Each of the third parties the FBI seeks to protect under Exemption 7(C) has a cognizable

interest in his or her personal privacy. Granted, some individuals have a greater interest than

others. *See Stern v. FBI*, 737 F.2d 84, 92 (D.C. Cir. 1984) (stating that individuals have a

"strong interest in not being associated unwarrantedly with alleged criminal activity");

*Schrecker*, 254 F.3d at 166 (recognizing that "the death of the subject of personal information

does diminish to some extent the privacy interest in that information"). At this juncture, how-

ever, it is the plaintiff's burden to demonstrate the existence of a public interest that outweighs

those privacy interests, *see Reporters Comm.*, 489 U.S. at 774-76, and the public interest must be

significant, *see Favish*, 541 U.S. at 172. The plaintiff makes two arguments to support his posi-

tion that a public interest outweighs the third parties' privacy interests asserted by the defendant.[5]

### i. "Collusion"

---

[5] The plaintiff's cross-motion for summary judgment pertains only to his argument that "there
exist[] substantial public interests that would be furthered by the disclosure of all 1,294 pages [of
responsive records] in full." Pl.'s Opp'n at 64. The Court will deny the plaintiff's cross-motion,
as it construes his arguments as opposition to the FBI's contention that the third party individu-
als' privacy interests outweigh any public interest in disclosure of the information the agency is
withholding under Exemption 7(C).

First, the plaintiff opines that the federal government and the Commonwealth of Kentucky colluded "to intentionally keep suppressed any and all information surrounding the 1988 prison escape and the fact that it was orchestrated by KSP personnel who were members and/or sympathizers of the Aryan Brotherhood as a reward for Glenn Burks['] murder[.]" Pl.'s Opp'n at 60; *see id*. at 16 ¶ 49. According to the plaintiff, Kentucky officials have therefore been shielded from criminal prosecution, *see id*., even though they were complicit in facilitating the escape, *see id*. at 60, 65. And, "premised upon the active collusion between Kentucky and the FBI," the plaintiff contends that these entities "engaged in a collusive cover up – of both the murder and [the] escape . . . – by suppression of . . . evidence [collected by Special Agent McGinty] for a tailored prosecution against [the plaintiff] to ensure a conviction in both the murder and escape cases." *Id*. at 26 ¶ 80. The plaintiff also believes that he was blamed for Burks' murder because "they" felt he had not been punished severely enough for the escape. *See* Pl.'s Opp'n, Ex. R.

The plaintiff asserts that "disclosure [of the information he seeks] will further the public interest," Pl.'s Opp'n at 64, by shedding light on the reasons "why has the U.S. Government engaged in collusion with the State of Kentucky to cover-up facts relating to the 1988 prison escape, that was facilitated by Kentucky State Penitentiary personnel who were members or sympathizers of the Aryan Brotherhood as a reward for the killing of Glenn Burks[,]" *id*.; *see id*. at 53. According to the plaintiff, the 1998 escape was a "reward" to members of the Aryan Brotherhood for murdering Burks, *see id*. at 65, and the government continues "to keep these facts from the public eye," *id*.; *see id*. at 5 ¶ 1-7 ¶ 6; *see generally* Notice Challenging Government's Disclosure Requesting Detailed Justification, Itemizing and Indexing under <u>Vaughn</u> with 5 U.S.C. § 552(a) In Camera Review, ECF No. 16.

### *ii.* "Actual Innocence"

Second, the plaintiff argues that "disclosure will further the public's interest in knowing

whether the FBI is withholding additional information . . . that could corroborate his claim of ac-

tual innocence," Pl.'s Opp'n at 65, on the assumption that the withheld records "contain . . . po-

tentially exculpatory evidence," *id.*, unavailable to the plaintiff at trial, *id.* at 66. He contends

that there is a "public interest in knowing whether Kentucky has prosecuted and obtained a con-

viction against the proper person [which] outweighs any privacy or confidentiality interests in

this 30-year old case." *Id.* at 65.

The Court finds neither argument persuasive. The so-called "collusion" between the FBI

and Kentucky is based on nothing more than speculation by the plaintiff. Far from having pro-

duced "[ir]refutable, non-speculative and tangible evidence," Pl.'s Opp'n at 68, the plaintiff sets

forth a wholly unsupported notion that the FBI and Kentucky officials have acted jointly to bar

the release of information about Burks' murder and the 1988 escape. Equally speculative is the

plaintiff's assertion "that the FBI is in possession of other potentially exculpatory information in

its files inclusive of information that supports his trial testimony . . . that he did not kill Glenn

Burks and was singled out for prosecution because he had not paid enough for his role in the

1988 prison escape." *Id.* at 69.

The plaintiff's interest in establishing his innocence of the Burks murder is a wholly per-

sonal interest which the Court need not consider. *See, e.g., Oguaju v. United States*, 288 F.3d

448, 450 (D.C. Cir. 2002) (finding that a requester's "personal stake in using the requested rec-

ords to attack his convictions does not count in the calculation of the public interest"), *vacated*

*and remanded*, 541 U.S. 970 (2004), *on remand*, 378 F.3d 1115 (D.C. Cir. 2004) (reaffirming

prior decision), *cert. denied*, 544 U.S. 983 (2005); *Engelking v. DEA*, 119 F.3d 980, 980-81

(D.C. Cir. 1997) (per curiam) ("To the extent [the appellant] argues that he seeks exculpatory information, [his] personal need for information is immaterial to whether that information is protected from disclosure by one of the exemptions to the FOIA."); *Brown v. DOJ*, 742 F. Supp. 2d 126, 133 (D.D.C. 2010) ("Assuming that plaintiff seeks documents responsive to his request in order to challenge his conviction and/or bring to light possible government misconduct, the Court finds that plaintiff has not demonstrated that either of these reasons constitute[s] a 'significant' public interest in documents concerning [a third party].").

The FBI's declarant has demonstrated that all the relevant records were compiled for law enforcement purposes, and, therefore, Exemption 7 applies. Further, the declarant has identified seven categories of third parties whose names and identifying information appear in the responsive documents. *See* Hardy Decl. ¶ 47. For each category, the declarant adequately demonstrates that disclosure of such identifying information "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). However diminished certain third parties' privacy interest may have become due to the passage of time or death, their privacy interest prevails where, as here, the plaintiff fails to identify a public interest in disclosure of information about these third parties of such magnitude that it outweighs the third parties' privacy interest. *Cf. Nat'l Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989) ("[S]omething, even a modest privacy interest, outweighs nothing every time."). The Court concludes that the FBI properly has withheld information about third parties under Exemption 7(C).

### 3. Exemption 7(D)

Exemption 7(D) protects from disclosure records or information compiled for law enforcement purposes that

> could reasonably be expected to disclose the identity of a confiden-
> tial source . . . [who] furnished information on a confidential basis,
> and, in the case of a record or information compiled by criminal law
> enforcement authority in the course of a criminal investigation . . . ,
> information furnished by a confidential source.

5 U.S.C. § 552(b)(7)(D).  There is no general "presumption that a source is confidential within the meaning of [FOIA] Exemption 7(D) whenever [a] source provides information [to a law enforcement agency] in the course of a criminal investigation."  *DOJ v. Landano*, 508 U.S. 165, 181 (1993).  Rather, a source's confidentiality must be determined on a case-by-case basis.  *Id*. at 179-80.  "A source is confidential within the meaning of [E]xemption 7(D) if the source 'provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred.'"  *Williams v. FBI*, 69 F.3d 1155, 1159 (D.C. Cir. 1995) (per curiam) (quoting *Landano*, 508 U.S. at 170-74).

The FBI relies on Exemption 7(D) to "protect[] information provided to the FBI by a local/state law enforcement agency," Hardy Decl. ¶ 66, to include "source interviews, polygraph reports, inmate interviews, inmate letters, and laboratory results regarding crimes that occurred within the [KSP,]" *id*.  According to the FBI, here the interviewees had "ready access to and/or knowledge about crimes committed within the [KSP, and such] access exposed them to potential significant harms, should their association and cooperation with local/state law enforcement – and by extension, the FBI – be publicly disclosed."  *Id*.  The FBI's declarant states that disclosure of this information would put not only the interviewees, but also their families, at risk.  *Id*. He further explains that there is "an expectation of confidentiality," *id*. ¶ 67, when state and local law enforcement agencies share information with the FBI, such that disclosure "would . . . greatly diminish[]," *id*., the FBI's cooperative arrangements with state and local law enforcement to the "detriment [of] effective law enforcement," *Id*.

In addition, the FBI represents that it is protecting information provided by third parties "concerning the activities of [the plaintiff], his associates, and/or others who were of investigative interest to the FBI and/or other law enforcement agencies for violent criminal and racially motivated activity within a state penitentiary." *Id.* ¶ 68. The FBI's declarant provides the following explanation for why the information was provided under circumstances from which confidentiality can be inferred:

> These individuals were in a position to have ready access to and/or knowledge about targets of investigative interest. Such access exposed them to potential significant harms that last through today, should their association and cooperation with the local/state law enforcement agency and/or FBI be publicly disclosed. The information they provided is singular in nature and concerns the activities of certain subjects of investigative interest to the FBI for civil rights violations. The disclosure of the identities of these sources and the information they provided could have disastrous consequences as disclosure could subject [them and] their families[] to embarrassment, humiliation, and/or physical or mental harm. The sources and source-identifying information withheld under [Exemption 7(D)] is information provided on very sensitive investigative matters, including the assault of inmates – one resulting in death – at the [KSP], the identity of members of the Aryan Brotherhood and/or racially motivated activities . . . . If [these sources'] identities were revealed, including the information they provided which was so singular in nature it would clearly reveal their identit[ies] *via* their levels of access to the information, it would place them in harm's way through possible retaliation. The identities of these sources and the singular information they provided would only be provided with the belief that their cooperation with the FBI would not be revealed.

*Id.*

The plaintiff responds by noting that the FBI "proffers no evidence that [he] has exhibited any display of violence or executed acts of retaliation . . . towards any person identified as a confidential source," Pl.'s Opp'n at 56, either during the course of post-conviction proceedings in the Kentucky courts or "in the last 30-years since many of these confidential sources actually tes-

tified at his trial in 1989," *id*. Because the plaintiff has not committed any act of violence or retaliation, he objects to any assertion that these third parties or their families are at risk of harm. *See id*. Insofar as interviewees provided information with knowledge that their statements could become the subject of court testimony, the plaintiff argues that "the Government cannot seriously maintain" that these individuals were acting under an implied or express assurance of confidentiality. *Id*. at 57.

"When no express assurance of confidentiality exists, courts consider a number of factors to determine whether the source nonetheless spoke with an understanding that the communication would remain confidential." *Roth*, 642 F.3d at 1184 (internal quotation marks and citation omitted). "These factors include 'the character of the crime at issue,' 'the source's relation to the crime,' whether the source received payment, and whether the source has an 'ongoing relationship' with the law enforcement agency[.]" *Id*. (quoting *Landano*, 508 U.S. at 172). Contrary to the plaintiff's assertion that the FBI's declaration "is wholly insufficient," Pl.'s Opp'n at 58, the declarant adequately explains the agency's rationale for withholding the identities and the information provided by individuals, particularly inmates, who had knowledge of violent and racially-motivated activities in a state penitentiary that provided them the ability to offer "information . . . singular in nature," Hardy Decl. ¶ 68, regarding civil rights violations at the prison. Although thirty years have passed since the information was provided, the declarant avers that the potential for retaliation "last through today," *id*., notwithstanding the Kentucky court's decision to make documents available to the plaintiff in recent post-conviction proceedings. The Court concludes that the declaration's statements regarding the nature of the underlying crimes and the sources' relation to them demonstrates that implied confidentiality existed. *See Mays v. DEA*, 234 F.3d 1324, 1329 (D.C. Cir. 2000); *Sandoval v. DOJ*, 296 F. Supp. 3d 1, 20 (D.D.C. 2017).

### D. Segregability

"[N]on-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *Wilderness Soc'y v. U.S. Dep't of Interior*, 344 F. Supp. 2d 1, 18 (D.D.C. 2004) (quoting *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977)); 5 U.S.C. § 552(b). An agency must provide "a detailed justification and not just conclusory statements to demonstrate that all reasonably segregable information has been released." *Valfells v. CIA*, 717 F. Supp. 2d 110, 120 (D.D.C. 2010) (citation omitted).

The FBI "reviewed a total of 1,184 pages," Hardy Decl. ¶ 4, of which it released 25 pages in full, released 148 pages in part, and withheld 1,011 pages in full, *id.* The government's declarant avers that the pages released in part contained "a mixture of material that could be segregated for release and material that was withheld as release would trigger foreseeable harm to one or more interests protected" under the claimed exemption(s). *Id.* ¶ 70.b. Regarding the pages withheld in full, the declarant states that "all information on each page was covered by one or more of the cited FOIA exemptions," *id.* ¶ 70.c., such that "no information . . . could be reasonably segregated for release without triggering foreseeable harm to one or more of the cited FOIA exemptions," *id.*

The plaintiff notes that "[t]he Government's math just doesn't add up[.]" Pl.'s Opp'n at 62. He asserts that "[i]t is without question that the Government located 1,294 pages of documents responsive to [his] FOIA requests," *id.*, and subtracting 173 pages of records withheld in full or in part, there remain 1,121 pages of records for which the FBI must account, *id.* If the FBI withheld 1,011 pages in full, the plaintiff claims that 110 pages "do exist, but have for some nefarious reason not been acknowledged, addressed or claimed exempted by any provision of the FOIA[.]" Pl.'s Opp'n at 62.

The plaintiff construes the FBI's initial estimate in a letter it sent to the plaintiff informing him of the number of potentially responsive records as if it were a definitive accounting of those records. However, the FBI informed the plaintiff in the letter that it had "located *approximately* 1,294 pages of *potentially* responsive" records. Hardy Decl. ¶ 11 (emphasis added). And, the declaration was prepared after FBI staff actually reviewed the potentially responsive records, after FBI staff determined which of these records were responsive, and after the FBI processed the responsive records. The FBI has therefore presented a reasonable explanation for this apparent discrepancy.

With respect to 11 pages of records, the plaintiff objects to the redaction of nearly the entire page, leaving visible only a file stamp on each page. Pl.'s Opp'n at 63; *see id.*, Ex. EE-OO. He deems the declaration deficient because it fails to provide a sufficiently detailed explanation for such extreme redactions. *Id.* at 63. The Court disagrees. The FBI's declaration states with reasonable specificity that, where information on a particular page was covered by one or more FOIA exemptions, no information could be reasonably segregated for release. *See* Hardy Decl. ¶ 70.c. This explanation suffices to establish the FBI's compliance with the FOIA's segregability requirement. *See Fischer v. DOJ*, 723 F. Supp. 2d 104, 115 (D.D.C. 2010).

## III. CONCLUSION

The FBI has established that its search for records responsive to the plaintiff's FOIA request was reasonable, that it properly withheld information under FOIA Exemptions 6, 7(C) and 7(D), and that it released all reasonably segregable information. Therefore, the defendant's motion for summary judgment is granted and the plaintiff's cross-motion for summary judgment is denied.[6]


DATE: December 2, 2019                          /s/
                                                REGGIE B. WALTON
                                                United States District Judge

---

[6] A contemporaneous order in accordance with the Memorandum Opinion has been issued by the Court.